May it please the Court, my name is Stephanie Adraktis and I represent the petitioner Kevin Bennett. In opening and in closing arguments in this case, the prosecutor told the jury that Bennett had chased Richard Gomez across a yard and stabbed him. The alleged chase was the highlight of the prosecutor's case against Bennett. The prosecutor argued as well that the trial was a credibility contest between Bennett and the State's witness, Paul Kitagawa. He argued that if the jury believed Paul Kitagawa's testimony that Bennett had chased Gomez across the yard, that it must reject Bennett's testimony that in fact the altercation between himself and Gomez had occurred right outside the door of the house and that Gomez had attacked him. Whose theory was that? Are you just saying the case? The prosecutor's theory was that there was a chase. Yes. Whose argument was the other one? Bennett. My client testified at the trial that in fact he asserted I did not chase Mr. Gomez and he said that he stepped outside of the house at about 1130 at night, that it was dark, that Gomez attacked him, and that he responded by pushing him, not realizing there was a knife in his hand. How big was this buck knife open? Six inches according to the testimony that I reviewed recently, and I believe that estimate came from the witness, the female witness. And in which pocket does Mr. Bennett say he carried this knife around open? I believe it was in the right-hand side. Front pocket? In the back. In the back. Next to his wallet. And it was described as a six-inch folding knife. I'd like to compare that as well to the case I cited in my brief, People v. Glenn, where the California Court of Appeal considered very similar testimony about a somewhat accidental and self-defense stabbing, and in that case the knife was a 12-inch butcher knife, obviously a fixed knife. I think the knife in this case, the description of the knife as an approximately six-inch folding knife, makes it more plausible that what Mr. Bennett was saying was true, because it was much smaller, it was a knife that could have been folded and could have flipped out during the course of the push that he described. Do you know whether there was a switchblade knife, or did he have to open it up manually? I don't know that. The best description I was able to find of the knife in the record comes from the witness, and I could provide the citation to the Court to the record, but there was a female witness who also lived in the house, O'Neill, and she described the knife as being a flip-type knife, and that it was about six inches long. But Bennett says he carried it open in his back pocket because he was afraid of Gomez.  So he wants somebody to believe that he had this open knife in his back pocket. He walked out not expecting any kind of an altercation at all. He got hit, and then he pulled out this open knife and pushed him away. What he said and what he testified to is that in the moment he thought he was just pushing Mr. Gomez, but that he had the knife in his hand. And I compare that testimony to that in Glenn, where the witness as well said that he was carrying a foot-long open blade knife in his back pocket, and that he accidentally stabbed the victim with it when he turned around, very similar to Mr. Bennett's statement. Although Mr. Bennett doesn't say he was turning, Mr. Bennett says he was reacting. And that's exactly what the witness, the defendant, testified to in Glenn. I frankly don't see how Glenn helps anybody in this case at all. It's another case. It's another case, but I believe that it goes to the plausibility of Mr. Bennett's story, and that was the heart of it. Just because there was a story in another case, that makes this case, the story in this case, plausible? Throughout. Did the guy in the other case go to another state, change his identity, disguise his face, disappear? Mr. Bennett. Did that happen in the Glenn case? It did not, but I don't know. Well, then that's, I mean, you know, okay. Mr. Bennett acknowledged in this case that, yes, I fled. I was afraid that I was going to go to jail, whether it was self-defense or not. And he acknowledged that. He also told the detective, Detective Ducey, who came in. Well, the issue, but let's try to get back to the issue. The issue is whether or not there was ineffective assistance of counsel. Yes, Your Honor. And clearly there was. I mean, as to the performance prong, it's a striking record. Well, everyone's pretty decided, pretty much decided there was sufficient performance that California court of appeals assumed it. So the question is really prejudiced. So why don't you argue that? Your Honor, I would point to the analysis in Richter, in particular, and this court's other cases. Is that the Richter that's currently under consideration by the Supreme Court? It is, Your Honor. So where do we get on Richter? I don't even really think Richter, I mean, I was on that panel. I mean, yes, it was another instance where the counsel didn't investigate. But here it seems like it was even worse because the counsel actually had the evidence that there was bloodstains on the patio, which supported his theory of the defense, and yet represented to the court that there were no bloodstains on the patio. But I guess the question is, is how does that materially affect the outcome of this case? I concur with the court's assessment. I couldn't find a case as bad as this one, which is one of the reasons I argued Richter in terms of counsel's performance. It's clearly prejudicial because looking at the jury question that was sent, were there any bloodstains on the patio? If so, where? The jury was clearly interested in that question. Is there any explanation for the prosecutor's failure to say there were blood spots on the patio? I have struggled with that question. And, you know, Mr. Bennett did raise an argument in the district court of what he deemed to be prosecutorial misconduct because this information about the bloodstains was certainly in the prosecutor's file as well. If one looks at the questioning of Detective Ducey that is in the record, very clearly those questions were leading and seeing things like, did you see the blood here? Did you see the blood there? Never was Detective Ducey asked, where did you find bloodstains? What was the blood testimony in the trial? That was the blood testimony in the trial. Which was what? Detective Ducey's testimony, yes, I saw that. And he testified in front of the jury? Detective Ducey testified only to seeing the blood that supported the prosecutor's theory. On the wall? On the wall. He wasn't asking about the patio? He was never asked by the prosecutor or defense. Or the defense. And you're saying that the prosecutorial misconduct issue, so it wasn't a Brady issue, it was maybe not full, the whole truth issue. It's kind of the finger. Yeah, right, right. That that issue was not certified. So that's why that's not in front of us. That's right, Your Honor. And as well, defense counsel had the information. He had a clear diagram, which is in the exercise record. And they shared that with the defense counsel, right? He must have, because, you know, in court, in State court cases in California, that's how the defense counsel gets the police reports is from the prosecutor. So they must have both had it. And it was very clearly in support of this. I thought the lawyer, I thought defense counsel admitted he had all that information. He provided the file to Mr. Bennett years later. And Mr. Bennett asked for it at sentencing. He said, I want my file. I want a CD. Is there any on-the-record explanation from counsel as to why he didn't believe that he had blood information in the file? No. One can look at the Marsden hearing, and you can see that counsel is just confident there isn't any. He said, well, obviously, you know, the jury believed Mr. Kitagawa over Mr. Bennett because the whole case, he said, turned on the bloodstain evidence. And that was based on his conversation with two jurors. So his own counsel said, at the time of the Marsden hearing, that he had heard from the jury that the whole case turned. He testified to that? He said it in the Marsden hearing. In the Marsden hearing. It's in the Marsden transcript, which is in the excerpts of record. And what happened in particular was that the defense lawyer gave a rather detailed account of this. He said, I was looking at the crime scene photographs with two of the jurors after the verdict, and they were looking for bloodstains on the patio, and they said the whole case turned on the fact that there were bloodstains. Can you use that to make an ineffective assistance of counsel claim? I believe so, Your Honor. Can you take information from the jury? I think that it is some of the best evidence that could be used. Yeah, whether you think it or not is interesting, but does the law say anything about it?  Because ordinarily you can't penetrate a jury's thinking like that. In this case, it came out during the Marsden hearing, and I do believe it supports Mr. Bennett's position. How much blood was there on the patio? I'm sorry, Your Honor? How much blood was there on the patio? If one looks at the diagram, it is not clear, but what we can see is that not only there are at positions two, three, and four there are bloodstains that are noted by the police. Positions two and three are right where Mr. Bennett said this incident occurred. Four is where Mr. Bennett says that Mr. Gomez went to after the stabbing happened, and also one of the police detectives, I believe it's Detective Rodriguez, noticed that there was a directional flow to that blood. So the testimony and this physical evidence could have been presented to the jury. The directional flow is inconsistent with the supposition that it was the dripping knife as he was on his way back into the house. Precisely because it states southeast, and that would be starting where Mr. Bennett says and going toward the other side. So the district court's analysis is contrary to what the police detective noted in his report. These very detailed, very credible police detective witnesses and the evidence they could have presented would have solidly supported Mr. Bennett's testimony, and that's why this was so prejudicial to him. There are a number of other reasons looking at the whole record why this was so prejudicial, because Mr. Bennett, the testimony that could have been presented to impeach Paul Kitagawa was also not presented. This whole idea that there was a chase, which was the subject of the blood testimony, but also Paul Kitagawa's testimony on that point could have been very clearly impeached by the statement that he gave to the detective about three hours after the incident occurred. I put that report in the excerpts of record. Three hours after the incident, Paul Kitagawa was interviewed by a detective. He didn't say anything about seeing a chase. He gave a statement that was utterly consistent with Bennett's account. He said that he was out by the garage and that when he came into the yard, he saw Gomez already down on the ground with his wife Sharon standing there. He says nothing about seeing a chase. What did Sharon say? Sharon said she gave a very strange account of the incident. No, I'm not asking you what your character was. I understand, Your Honor. Of course you thought it was Sharon. Because in the beginning she says that she is going back and forth into the house to check on her children during this incident, but later in her testimony she said, I stepped out of the house, I heard a scuffle, I didn't see it happen because they were both behind me. That's consistent with what Bennett testified to. And it's inconsistent with what Paul Kitagawa said. Did either of those people see the chase out in the backyard? Paul Kitagawa testified at trial that he saw a chase, but that's not what he told the police on the night this happened. And that is another significant failure in this case, where defense counsel never impeached Paul Kitagawa with his prior statement. If he had, the jury clearly, if they had the blood evidence, if they had Paul's prior statement that he didn't see a chase, essentially completely giving a different story on the same night this happened, the jury would have believed Bennett. Is this defense attorney still alive? That is my next question. Was there ever an evidentiary hearing on this? Mr. Bennett represented himself in the district court proceedings. Did he ask for an evidentiary hearing? I believe that he did, yes. Wait a minute. Did he or didn't he? My recollection from reading the papers is that he did. But I can provide the citation to the record in a letter to the court. Well, is one of your arguments on appeal that the denial of an evidentiary hearing is improper? It's not an argument on appeal, Your Honor. I believe one would have to ask to revise that procedurally, I think, that that issue is not before the court. But on the record that we have here, did Mr. Bennett need an evidentiary hearing? Literally, this evidence is so compelling. The bloodstain diagrams, the statements of the person. I'm just wondering what explanation, if any, his attorney offered for his division. The Marsden hearing transcript is very telling on that point because counsel clearly did not know. He had not read the papers in his own file. He thought there was no blood on the patio. He clearly didn't know that Paul Kitagawa had given a prior inconsistent statement because he never asked Mr. Kitagawa any questions about that. He didn't ask Detective to say one question, not one. It's striking. This is a murder case. You don't know what Bennett told him either, though, do we? Bennett said a lot of things. You know, Your Honor, one thing that really troubles me about counsel's statements about Mr. Bennett on that point, he says Mr. Bennett had a lot of stories, Mr. Bennett, this and that. Well, Mr. Bennett, in his traverse, very clearly denies that. He says I never gave him different stories. He says check the jail records. This man never came to visit me, not once. That was what Mr. Bennett said, check the jail records. And he also said why would I have given my counsel a false alibi when I told Detective Ducey when he came to get me that I did this to have Mr. Gomez in self-defense? He'd already told the Detective that prior. Bennett's a typically disordered sociopath who you can't believe for anything. I mean, you know his record and his background and who he is. He gave an internally consistent testimony at trial. Looking at his testimony and reading the cross-examination, he didn't budge from what he had said initially. And so his testimony is internally consistent, and he does give the same statement to the jury that he gave to the detective when the detective picked him up. May I ask you this? Is it your position that if the jury believes that there was a scuffle right there on the patio, right off the back of the house, that that therefore equals self-defense? If the jury believed that there was a scuffle right there. Is that still self-defense? Not in and of itself. One has to take that together. Isn't it true that the defendant followed the man out there? He was behind him. He was right behind him. Well, would you say that means he followed him? If he's coming out there behind him? Mr. Bennett says that he was coming behind him to help carry some furniture. I don't know what his motivation was, but he did follow him out there, didn't he? Apparently, yes. And he had a knife that he wasn't aware that he had? He had a knife in his pocket. He does say that he was aware that he had it in his pocket. His testimony was that he essentially reflexively was reacting to being punched. He had it in his pocket because he was afraid of Gomez. Right. He was afraid of Gomez. With a 6-inch knife. And in this context, when one looks at the testimony concerning what is going on in this house, it's not terribly surprising that Mr. Bennett had armed himself to protect himself because, according to him, there was a lot of drug use going on in the house. There had been some criminal activity at the house, people stealing things from other people. He said that Gomez and he had disagreements, Mr. Bennett. Were there witnesses to those disagreements? Actually, Your Honor, when Sharon Kitagawa testified, she said they got along fine that day. Mr. Bennett's account is somewhat different, where he says that he was annoyed by Mr. Gomez's presence in the house because Mr. Gomez was a thief. He wasn't paying rent, and he had made comments to him. Yes. And they had had some words, and he says that Mr. Gomez threatened him. And that was Mr. Bennett's testimony. And so, under these circumstances, When did he threaten him, before the defendant followed him out in the patio? Before, yes, that night. Did he go out to settle it? That's not what Mr. Bennett says. Mr. Bennett says that he went out to help Sharon and Paul, who were unloading furniture, and that he went out to help as well, and that was his. So what was Bennett's defense, that this was an accident? It was a combination of accident and self-defense, and the trial judge instructed on both, and both of those are legitimate defenses under California law. That's another reason I pointed to people versus Glenn, because this is not, clearly not, a pure self-defense case. It is a combination of an accident and defense of oneself, but Glenn makes it clear that that is a potential defense to a murder case in California, and that Mr. Bennett properly weighs that. All right, counsel. Yes, you're well over your time. Thank you. I'd like to hear from the State. Deputy Attorney General Marcon, for the people, excuse me, for the warden, may it please the Court. First, just briefly about the knife. What I'd like to point out is he had it open in his pocket with his testimony, and that somehow he was able to reach in there, grab it suddenly, and stab the victim without hurting himself. After he stabbed the victim, although he never expressly admits that he stabbed the victim, his testimony was he doesn't really know what happened. He felt he pushed the victim away, but his testimony is that, I closed the knife, then I put it in my pocket. So he knows how to be careful with the knife. Afterwards, he certainly knew how to close it up and put it away. That's in the excerpts, page 174. As far as the blood evidence, it's been really exaggerated as to what the evidence, what the mention of the blood evidence is in the police reports. The victim, excuse me, Petitioner's testimony was that he took two steps outside, and then there was this conflict, where supposedly Gomez punched him, punched him in such a way that didn't actually cause the injury, and then Petitioner pushed him or stabbed him. So two steps outside, that's Petitioner's testimony. He says it over and over again. But when you look at the chart, as far as I understand it, it indicates that there was the blood drops found 10 feet away. So just saying that somehow pointing to these blood drops 10 feet away from the exit would have corroborated Petitioner's statement is not true. It doesn't corroborate the statement. Even if it did, if there were blood drops found there, we don't know what these blood drops were from. We have to imagine how would the trial have been different if trial counsel had asked more questions about this report. Would the answer have simply... Well, couldn't the blood, I mean, I guess this is the way it does resemble Richter. I mean, the blood drops could have been tested to see whose blood it was. And, I mean, they also corroborate that he wasn't chasing the victim. He was actually, he hit back once, and then the victim, whatever, moved. I mean, doesn't it corroborate his self-defense and accident theories? Well, at best it could indicate that something happened right at that location. I don't think it supports the theory of self-defense or accident. Well, I've got a problem with how the prosecution handled this, too, because if it, I mean, if the prosecution didn't see it as undermining its case, why didn't the officer testify to all the locations where the blood was found when it was in the police report and they had a diagram of it? And there might have been a perfectly good reason for that. We're just guessing now. It could be that the prosecutor didn't think it was important. It could be that there was a very good explanation for it and maybe that it had to do with the moving of the body. And what about the silence in the face of the jury question about where was the, where were the blood? As I recall, the jury question was, was there evidence presented about blood drops on the patio? And the answer is no evidence was presented on that topic, which is simply accurate. Was that diagram in the jury room? Not that I recall, no. Where did they get the idea of the blood spatter? Whether there were blood drops on the patio? If they, they raised the question. First of all. Didn't they have something in the jury room that showed a diagram of blood spots? Well, I think evidence was presented regarding pictures. I'm sorry? Evidence was presented regarding pictures of blood spatter that indicated where the victim fell and indicated that's where the victim fell. So the prosecution presented a partial portrayal of where the blood drops were? I think the prosecution simply presented photographs that indicated that the victim fell where the testimony was the victim fell. There isn't any claim before this Court as far as whether the prosecutor committed misconduct. I know there's not a claim, but I have to say I'm pretty troubled by, by this fact in that, I mean, there, it's, because the jury attached importance to it and the jury did not show the complete picture. It tends to make me think that there is prejudice. I think that's taking far too many steps. And again, I don't, first of all, I don't believe that this blood spatter, the evidence that there's some blood drops being found, corroborated his story. I don't believe it's the same as his story. His story was two steps outside and the blood drops were farther away. Would it be relevant to a defense of self-defense? Would that blood spatter found on the patio there where they fought, would that be relevant to a claim of self-defense? It could have some relevance. Would it bolster a claim of self-defense? I'm sorry, I didn't hear you. Would it bolster the claim of self-defense? I don't think so. I'm not saying prove it. Would it bolster it? Right. And I don't think so for two reasons. You don't think so? First of all, because I don't believe that the blood drops in the diagram are in the same place that Petitioner indicated they were. Second of all, and I think this is the most important point and what the magistrate just found, was that Petitioner didn't have a credible self-defense theory, even if, or a credible theory of accident. And even if you view his statement as the truth, it still doesn't. But that's up to the jury to decide based on a complete picture of the evidence. It's not, I mean, that's the question before the jury. And at this point, we have to decide, is it reasonably likely that the jury would have found a more favorable verdict in favor of Petitioner? Well, what would, in your view, is the choice between acquittal and conviction? Is that what would be a more favorable outcome? In this particular case? Is that your position? Yes. Well, what about a lesser offense? He was charged with murder. He was convicted of second-degree murder, wasn't he? Right. Well, what about if self-defense is a virulent defense? Could that have an effect on the crime chosen by the jury to convict him of? For example, manslaughter? If this was a case where he could have presented, perhaps, imperfect self-defense, then yes, he could have gotten a lesser verdict. But if you look at his... Would that be a more favorable outcome? Yes. But if you look at his testimony, he's asked, did you fear for your life? He says, I could say yes. I could say no. He doesn't say I acted in self-defense. His statement is, he punched me once. It didn't cause any injury. I pushed him away. And in retrospect, I realize I must have stabbed him. That's his statement. It's not a statement of self-defense. He doesn't testify, I feared for my life and I acted to defend myself. Well, wait a second. That's for the jury to decide, isn't it? Whether that was pushing away amounts to a self-defense or not, you're saying that as a matter of law, that doesn't amount to a self-defense? Well, yes. If a Petitioner, if a victim says I acted, simply saying I acted to defend myself doesn't establish self-defense. We're not talking about the victim, are we, here? We're talking about the defendant. Right. Petitioner, there has to be credible evidence indicating self-defense. And here we have a case where Petitioner in his testimony says, he can't give a straight answer whether he acted fearing for his life. I can't give an answer as to what? As to whether he feared for his life. He's asked. He says, I was scared when he hit me. I was scared. Right. Scared is not the standard for killing somebody in self-defense. Well, he... When I talk about killing him, we're talking about self-defense. If somebody came up and confronted you and was about to hit you and you were scared and you pushed him or stabbed him or hit him, would you claim self-defense? That wouldn't be a valid defense for using fatal violence against someone. You can't use extreme violence simply because someone touches you. If someone touches you and touches your arm... Well, didn't he have a defense on that point of accident? No, he didn't have a defense. He didn't realize. Didn't he say he didn't even realize he had a knife in his hand? Right, and that is his statement. But purely saying, I didn't mean to do it, doesn't necessarily establish accident. What was the accident that happened here? Was the accident going back down there after, in his own words, it had been a near fight? He knew, and the petitioner says, Gomez was ready to fight me. I left believing he was going to fight me. That's his testimony. So was it an accident going back down there? I left, you said? I left? Petitioner and Gomez had been... Petitioner's version of events was that there had been some kind of verbal conflict and that Gomez had then assumed the fighting stance. Petitioner decided to leave the area. He went back up to his room. Then, his story is, I went back down there barefoot to help him move. This is Petitioner's version. So was it the accident that he went back down there knowing there had almost been a fight? Was it an accident that he brought a knife with him? Was it an accident that he had this knife unfolded? When we know he certainly knows how to fold it, he remembers specifically closing it after the stabbing. So was the accident reaching into his pocket and grabbing the knife and pulling the knife out and stabbing Gomez? Were all of those things accidents? Him just saying it was an accident doesn't amount to credible substantial evidence of the accident. The whole incident seems a little odd if you don't believe that Gomez actually punched him. I mean, you would be... You'd almost have a first-degree murder case, right? That he went out there intending to kill Gomez? Yes. If you don't believe at least parts of his story? Yes, it certainly could be first-degree murder, yes. But the government didn't try to prove that? I honestly don't remember if that went to the theory. You didn't charge first-degree, did you? I don't remember. I cannot answer that question. Why does everybody come to this court without having reviewed the relevant documents in the case? I see. I'm really getting tired of it. I mean, we spend a lot of time trying to get prepared for all these cases, and we can't get answers from the attorneys. True, and I don't have the answer to that question, and I apologize, but I don't think that's determinative in this case. Well, it's interesting in terms of what kind of... You're arguing his theories of defense don't have any credibility, and what I'm saying is, well, if they don't have any credibility, if you don't believe any part of this story, then why didn't you charge him first-degree murder? Because then you would really have an intent-to-kill case. That's true, and I can't read the prosecutor's mind as to what the prosecutor was thinking. But I think under the facts we have here, we have a defendant offering that is horribly not credible theory. That's what you're saying. My point is that it has to be at least partially credible. Why did the jury ask the questions? They were asking self-defense questions, weren't they? They asked the question, and what they were thinking... Those were self-defense questions, weren't they? Right, and I don't think we can read too much into what they say. We don't have any testimony from any jurors, any actual statement from the jury. We have the defense attorney making a statement that he spoke to two of the jurors, and the jurors were interested in blood. We don't know exactly what the jurors said to him, because when we look at the transcripts, we don't know what defense counsel is describing in his own words and what the jurors actually said to him. Well, we do know what counsel said at the Marston hearing, that the entire case turns on whether there was any blood on the patio. That's what defense counsel said, but we don't know if that's his own spin, his own interpretation. Hold on a second, though. That's the whole issue in this case is whether he's incompetent, and he said at the Marston hearing, the whole case turns on whether there was blood on the patio, and he didn't know there was. And there was. He said the whole case turns on that. But that's his statement. It doesn't necessarily make it true. But that's a statement against his interest. But that doesn't mean that he's right. Well, right. He wouldn't make that statement if he didn't believe that it was true. And, again, that doesn't mean that it's correct. If he thought the whole case turned on whether there was blood on the patio in his client's favor, he'd sure put on evidence that there was blood on the patio. And I'm not standing – I'm certainly not standing before you saying he didn't understand. But you're saying it's harmless. He didn't think it was harmless. And I don't think that matters. I think the question to decide – certainly you could phrase it as was he right, and I think the answer is certainly he's not right. So you give us a scenario that these two gentlemen – excuse me, gentlemen – got into some kind of a verbal confrontation, and Gomez assumed a fighting stance. Is there any description of what that fighting stance was? I mean, did he go like this, or what did he do? Not that I recall. I believe the phrase was fight – I don't know. I believe the phrase was fighting stance. I don't recall at the moment whether it indicates in the record that Petitioner did some kind of physical – Now, who said he assumed a fighting stance? I think that was Petitioner's testimony. Bennett. But this – So then what did Bennett do, according to what the record shows? Bennett left. Petitioner's testimony is I left. And how long – how much later did he come back? A short period of time. And this time with an open knife. Right. This time he goes back down to court. And then he follows Bennett – he follows Gomez onto the patio. Right. That's exactly right. But that was the same direction as going to help with the furniture, too. It wasn't just following Gomez. They were all supposedly helping move the furniture in, right? Right. So he's going out behind Gomez. They're all going to move the furniture. I mean, I could see that a jury could conclude from that that Gomez was clearly in some kind of an attack mode, and he had his knife with him in case Gomez attacked him. And Gomez was stabbed in the front, not the back. Right. That's true. Obviously, the Petitioner wasn't chasing him when he stabbed him. He was facing him. Right. That's correct. That's true. And the testimony – Doesn't that kind of bolster the idea of possibly self-defense? At least combat, face-to-face combat. And in his version, the defense is it was face-to-face because he was attacking me. That is his testimony. But he hasn't testified that it was a self-defense. Well, at least it bolsters the idea, doesn't it? It bolsters the idea of self-defense, doesn't it? That he stabbed him in the chest? Yes, and the jury knew that, that he stabbed him in the chest. There wasn't any dispute about that. And the testimony about the chasing was a very small testimony about the chasing. Paul was the only one who said he saw it. And even Paul's testimony was that he wasn't really sure how far Petitioner Chase had gone. It's really strange that he was chasing him when the only stabbed wound is the one in his chest. I mean, you'd think if he was really wanting to kill him, he would have stabbed him a couple more times. He saw he didn't need to at that point. How would you know that? I mean, how would anyone know that, whether you needed to? I think at this point it's too much guessing. I think the point is, what was his testimony? Even looking at his version of defense. Well, his testimony is the prosecutor asked him, so you were ready for Ricky Gomez, right? Actually, no. Okay, well, I was ready to not be assaulted. He was worried. He was afraid he was going to be assaulted. And I don't understand what that could mean. I was ready not to be assaulted? He knew they almost just got into a fight, and he had a knife with him. He was exactly ready to be assaulted. That's what he anticipated happening. He knew they'd almost had a fight. He didn't want to be defenseless when he was assaulted. Which, again, indicates he foresaw this happening. He foresaw a fight, and he brought a knife to make sure he'd be able to win it. And sure enough, even under his version of offense, to the extent there was a fight, Gomez punched him once. It didn't cause any injury. And the Petitioner used the knife he brought him and killed him. You're well over your time, Counsel. Was there a request for an evidentiary hearing in the district court? By the Petitioner, I believe so. That was just turned down, but that's not an issue here. No, that's not an issue. Thank you very much. Thank you, Counsel. Lee versus Smith, did you have one minute? You're well over, but you want to answer two questions? I'm going to quickly answer questions that came from the panel. The diagram, I believe Judge Brewster asked whether that was with the jury. There's no indication in the record that that blood diagram was ever admitted or given to the jury. I thought the jury wondered what those spatters were on the patio. They asked a question. They asked were there blood stains on the patio, but they did not have the diagram evidence. That was never admitted. It was not presented during the trial. Have you looked at the exhibit list? No, Your Honor. There was no evidence. The person who created the diagram is not called as a witness, so it couldn't have been admitted. It wasn't. Well, it could have by stipulation. I mean, there are any number of ways it could have been. I understand, Your Honor. I reviewed the entire record, and I did not see it. You didn't look at the exhibit list, though? I did, Your Honor, and I did not see that on the exhibit list. Do you have a copy of the question that the jury asked? I do, Your Honor. What verbatim did they ask? Verbatim they asked were there any blood stains on the patio, if so, where? And there's an exclamation point after that. Thank you. Thank you, Your Honor. Thank you, Counsel. All right. Bennett v. Tilton is submitted, and we'll take up Lee v. Jacquez.
judges: Brewster, Trott, Wardlaw